NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois  60604**

Argued January 23, 2007
Decided February 8, 2007

**Before**

Hon. JOEL M. FLAUM, *Circuit Judge*

Hon. MICHAEL S. KANNE, *Circuit Judge*

Hon. ANN CLAIRE WILLIAMS, *Circuit Judge*

No. 05-4528

| | |
|---|---|
| DARRYL PINKINS, <br> *Petitioner-Appellant,* | Appeal from the United States District Court for the Northern District of Indiana, South Bend Division. |
| v. | No. 3:05-CV-134 AS |
| EDWARD BUSS, <br> *Respondent-Appellee.* | Allen Sharp, <br> *Judge.* |

## O R D E R

Indiana inmate Darryl Pinkins is serving a 65-year sentence for his role in the gang rape of M.W.  After unsuccessfully pursuing a direct appeal and state postconviction petition, he petitioned the district court for a writ of habeas corpus. The district court denied relief, but this court granted a certificate of appealability after concluding that Pinkins had "made a substantial showing of the denial of a constitutional right to effective trial counsel."  Pinkins, though, procedurally defaulted most of his theories of ineffective assistance, and he has failed to demonstrate that the Indiana courts unreasonably applied clearly established federal law in disposing of those he did not default.  Thus we affirm the district court's denial of Pinkins's petition.

For our purposes, we accept as true the factual findings of the Indiana courts.
*See* 28 U.S.C. § 2254(e)(1).  On December 7, 1989, at approximately 1:30 a.m., M.W.
was driving home from a friend's house when her car was rear-ended at an
intersection in Hammond, Indiana.  She exited her vehicle, as did the driver of the
other car, who approached M.W. and asked if she was all right.  Before she could
answer, however, the other driver grabbed her arm.  Two more men then grabbed
her from behind, dragged her to their car, and shoved her into the back seat.  Before
being told, "Don't look at us, bitch, or we'll kill you," she observed a total of five men
at the scene, and at some point she was given a pair of green coveralls and ordered
to cover her face.  The vehicle then began moving while a man in the backseat
stripped her naked and raped her.  The other four men also took turns raping her.
The assault continued for about two hours before her assailants stole the rings off
her fingers and returned her to her car.

It was five months after the attack that M.W. first identified Pinkins as the
driver of the vehicle that rear-ended her.  During an interview shortly after the
assault, M.W. had told investigators that she knew by his voice that the fourth man
who raped her was the driver of the other car, but she could give only vague
physical descriptions of her attackers and refused to look at a photograph array.
On May 4, 1990, however, M.W. attended, on her own initiative, a pretrial hearing
in the case where Pinkins and at least one other man charged in connection with
the assault were present.  M.W. saw Pinkins, who had been released pending trial,
enter the courtroom and immediately recognized him as the driver of the car that
struck her the night she was raped.  After the hearing, she told a detective and the
deputy prosecutor that Pinkins was one of her attackers.  She did not identify
anyone else at the pretrial hearing as an assailant.

Pinkins was tried in the Superior Court of Lake County, Indiana, on charges
of rape, criminal deviate conduct, and robbery.  During the three-week jury trial the
state presented two pieces of direct evidence against Pinkins.  First, M.W. testified
concerning the events of December 7, 1989, and identified Pinkins in court as the
driver of the vehicle that rear-ended her as well as the fourth man to rape her.
M.W. also testified that she previously had recognized Pinkins when she voluntarily
attended a pretrial hearing and that prior to that time she had not viewed a
physical lineup or photographs of any suspects in her case.  Second, an inmate who
had been incarcerated with Pinkins testified that Pinkins told him that he and two
friends had raped a woman while covering her head with green coveralls and that
he was not concerned about DNA tests because he did not ejaculate inside of her.

The state also presented circumstantial evidence connecting Pinkins to the
attack.  Of particular significance, evidence showed that the police had traced the
coveralls given to M.W. to cover her face to Pinkins's employer and established that
Pinkins and two of his co-workers were issued new coveralls four days after the

assault.  Evidence also established that Pinkins had approached co-defendant Barry Jackson and his attorney during a pretrial hearing and told the lawyer that he did not understand why Jackson had been arrested because Jackson was not with Pinkins and the other men on the night of the assault.  In addition, employees of two adult entertainment venues testified as to Pinkins's physical description and typical attire, explaining that they were familiar with Pinkins because he was a frequent customer.

The state also presented forensic evidence derived from two types of testing—DNA and serology.  The state's expert described the difference between DNA and serology testing, explaining that DNA testing is more "specific," meaning that the number of potential contributors to the sample could be narrowed to a very few people, but that serology testing is more "sensitive," meaning that testing could be performed on a smaller sample of genetic material.  She also explained that DNA testing will yield a result only if the sample contains a nucleated cell, such as sperm, but serology testing will yield a result from samples that do not contain a nucleated cell, such as samples containing seminal fluid or saliva.  According to the expert, DNA testing performed on bodily fluid samples collected from M.W's clothing and vagina immediately following the attack disclosed three separate genetic codes.  One code matched M.W.'s genetic code; the other two codes were not a match for any of the five suspects.  Serology testing of the same samples, however, revealed that blood serums with properties matching those of Pinkins's blood type were present in some of the samples.

The jury found Pinkins guilty on all counts.  He was sentenced to 40 years in prison for rape and to a consecutive 25 years for criminal deviate conduct.  In addition, he was sentenced to 10 years for robbery to be served concurrently with his other sentences.  Pinkins filed a notice of appeal, but his direct appeal was stayed for twelve years while he pursued a postconviction petition.

Pinkins's postconviction petition was denied by the trial court after several evidentiary hearings.  He appealed that ruling to the state appellate court.  In a proceeding that consolidated his direct appeal and his appeal of the trial court's denial of postconviction relief, Pinkins set forth five issues for review, but only the two issues arising from his postconviction petition are relevant here.  First, he argued that the trial court erred when it declined to vacate his conviction or grant him a new trial based upon a new round of DNA testing performed in 2001.  That testing was performed using a more advanced testing procedure than was available at the time of Pinkins's trial but yielded results that were basically the same as the 1991 results.  Second, he argued that his trial counsel was ineffective because counsel allegedly slept through portions of the trial, failed to object to the evidence that Pinkins frequented strip clubs, and failed to suppress M.W.'s in-court

identification of Pinkins. The appellate court affirmed, concluding that no reversible error occurred.

Pinkins petitioned the Indiana Supreme Court for transfer. In his supporting brief he proposed five questions for review: whether the appellate court erred when it concluded that Pinkins's trial counsel was not ineffective for failing to object to evidence that Pinkins frequented strip clubs; whether the appellate court erred under state and federal law when it concluded that Pinkins's trial counsel was not ineffective for failing to object to M.W.'s identification of Pinkins as her assailant; whether the appellate court's determination that the 2001 DNA test results were not favorable to Pinkins within the meaning of Indiana Code § 35-38-7-19 decided an important question of law that should be decided by the state supreme court; whether the appellate court erred when it held that the trial court did not commit fundamental error under state law by admitting evidence that Pinkins frequented strip clubs; and whether the appellate court erred when it held that prosecutors did not commit misconduct by introducing the strip-club evidence. The Indiana Supreme Court denied transfer.

Pinkins then filed his federal petition under 28 U.S.C. § 2254, raising three claims for consideration by the district court. First, he claimed that he was denied due process of law because the state presented false or misleading serology evidence. Second, he claimed that he received ineffective assistance of appellate counsel. Third, he claimed that he received ineffective assistance of trial counsel, in that counsel allegedly slept during portions of the trial, failed to object to the evidence that Pinkins frequented strip clubs, failed to object to M.W.'s identification of Pinkins, failed to meaningfully challenge the state's serology evidence, failed to object to evidence concerning a dispute between a witness and Pinkins that escalated into a threatening gesture, and failed to object to testimony from Pinkins's employer concerning his reputation for honesty and truthfulness. In a very brief order, the district court denied Pinkins's petition.

On appeal Pinkins has recast the content of his ineffective assistance of counsel claim for a fourth time. He now contends that his trial counsel's performance was constitutionally deficient because he allegedly slept through portions of the trial, failed to object to the evidence that Pinkins frequented strip clubs, failed to challenge M.W.'s in-court identification of Pinkins, and failed to meaningfully challenge the state's serology evidence.

Federal-court review of Pinkins's convictions is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Under AEDPA, a federal court cannot grant relief under § 2254 to a state prisoner whose federal claims have been adjudicated on the merits by the state courts unless the decision "was contrary to, or involved an unreasonable application of, clearly established

Federal law, as determined by the Supreme Court of the United States," or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see Brown v. Payton,* 544 U.S. 133, 141 (2005); *Charlton v. Davis*, 439 F.3d 369, 374 (7th Cir. 2006). We look to the decision of the last state court to rule on the merits of the petitioner's claim: here, the opinion of the Court of Appeals of Indiana affirming the denial of postconviction relief. *See Garth v. Davis,* 470 F.3d 702, 710 (7th Cir. 2006). The district court's order denying Pinkins's petition under § 2254 is subject to *de novo* review. *See Charlton*, 439 F.3d at 372.

Pinkins's ineffective-assistance claim is governed by the principles established in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a defendant must show that his counsel's performance fell below an objective standard of reasonableness and that he was prejudiced as a result. *Id.* at 687-88. To establish prejudice, a defendant must show that but for counsel's errors there is a reasonable probability that the result of the trial would have been different. *Id.* at 694. Federal courts do not apply the principles of *Strickland* directly to a claim of ineffective assistance that has been adjudicated by the state courts; instead, the role of the federal courts is limited to analyzing whether the state courts reasonably applied federal law in concluding that trial counsel was not constitutionally ineffective. *Conner v. McBride*, 375 F.3d 643, 657 (7th Cir. 2004).

As an initial matter we must consider whether Pinkins procedurally defaulted two of the theories underlying his claim of ineffective assistance of trial counsel. The state argues that when Pinkins petitioned the Indiana Supreme Court to accept transfer of the appellate court's decision, he failed to present his theory that counsel was ineffective because he slept during portions of the trial. The state also contends that Pinkins never presented at all to the Indiana courts his theory that counsel was ineffective for failing to challenge the serology evidence. We agree.

To preserve a federal claim for collateral review, a state prisoner must take the claim through one complete round of review in the state courts, including a petition for discretionary review in the state supreme court if available, and must fairly present the federal nature of his claim to the state courts. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845-48 (1999). Fair presentation requires that "both the operative facts and the controlling legal principles" be submitted to the state courts, *Hough v. Anderson*, 272 F.3d 878, 892 (7th Cir. 2001); *see Wilson v. Briley*, 243 F.3d 325, 327 (7th Cir. 2001), so that the state courts have "a meaningful opportunity to pass upon the substance of the claims," *Chambers v. McCaughtry,* 264 F.3d 732, 737-38 (7th Cir. 2001). A state defendant who "fails to present his claims in a petition for discretionary review to a state court of last resort" has not properly presented his claims to the state courts. *O'Sullivan*, 526 U.S. at 848; *see Hough,*

272 F.3d at 892.  This failure results in a procedural default that precludes federal review.  *Hough*, 272 F.3d at 892; *Wilson*, 243 F.3d at 327.

In this case Pinkins did not present through one entire round of state review his theories that counsel was ineffective for allegedly sleeping during trial and for failing to meaningfully challenge the state's serology evidence.  The theory that counsel slept through portions of the trial was never presented in his petition for transfer, and the theory that trial counsel should have done a better job of challenging the serology evidence was never presented at all.  Pinkins maintains that he alerted the Indiana Supreme Court to the facts of these two theories because he included citations in his petition to transfer that referenced his brief to the state appellate court and the response brief filed by the state in that court, but those references concerned only his arguments that counsel was ineffective for failing to object to the pre-trial identification procedure and for failing to object to evidence concerning his frequenting strip clubs.  Consequently, he did not fairly present these theories to the Indiana courts.  Pinkins also argues that a procedural default may be set aside if caused by "attorney error that constitutes ineffective assistance of counsel."  But Pinkins had no federal constitutional right to counsel in pursuing his state postconviction petition and subsequent appeals, so any error by counsel that led to a default of Pinkins's theories in state court cannot constitute cause to excuse default in the federal collateral proceedings.  *See Coleman v. Thompson*, 501 U.S. 722, 756-57 (1991).  Accordingly, Pinkins failed to exhaust his state-court remedies, resulting in procedural default of these theories.

As to the two theories that we may review, Pinkins first contends that trial counsel was ineffective because he failed to object to what Pinkins characterizes as "bad character" evidence.  Pinkins identifies testimony from four state witnesses that, he says, concerned his "proclivity to spend time at topless bars," as well as testimony that counsel elicited from him which, he says, portrayed him as a racist and liar.  According to Pinkins, this evidence prejudiced him by "painting him as some sort of mad sex-fiend."

A claim of ineffective assistance based on counsel's failure to object is "tied to the admissibility of the underlying evidence." *Hough*, 272 F.3d at 898.  Questions concerning the admissibility of evidence are generally governed by state law.  *Milone v. Camp*, 22 F.3d 693, 702 (7th Cir. 1994).  If evidence admitted without objection was admissible, then a defendant's argument fails both prongs of the *Strickland* test.  *Hough,* 272 F.3d at 898.  A federal court will rarely find ineffective assistance of counsel "based upon a trial attorney's failure to make an objection that would have been overruled under the then-prevailing law." *Lucas v. O'Dea*, 179 F.3d 412, 420 (6th Cir. 1999).

With respect to this theory, the Court of Appeals of Indiana determined that any objection to the "bad character" evidence would have been overruled. The court explained that the evidence would have been admitted over counsel's objection because it "did not amount to uncharged crimes or prior bad acts" that might have rendered the evidence inadmissible. *Pinkins v. Indiana*, 799 N.E.2d 1079, 1095 (Ind. Ct. App. 2003). Pinkins does not challenge this determination.

Pinkins next contends that trial counsel was ineffective because he failed to object to M.W.'s in-court identification. He says that M.W.'s encounter with him at the pretrial hearing five months after she was attacked constituted an overly suggestive out-of-court identification that "irreparably tainted" her in-court identification. Given that "M.W.'s identification of Pinkins as one of her attackers was crucial for the state's case," Pinkins insists, "the trial judge should have been asked to rule on its admissibility."

Unlike Pinkins's theory that counsel was ineffective for failing to object to the "bad character" evidence, Pinkins's theory that the trial court wrongfully allowed into evidence M.W.'s in-court identification presents a federal question because it implicates due process. A state prisoner is entitled to collateral relief if, in answering the federal question, the state court unreasonably applied clearly established federal law. *Williams v. Taylor*, 529 U.S. 362, 367 (2000); *Badelle v. Correll*, 452 F.3d 648, 654 (7th Cir. 2006). An unreasonable application of federal law "occurs when the state court correctly identifies the governing legal rule but applies it unreasonably to the facts" of a petitioner's case. *Badelle*, 452 F.3d at 654. An unreasonable application of governing federal law is not merely an erroneous decision, but must be so erroneous as to be objectively unreasonable. *Id.*

A petitioner claiming that an in-court identification violated due process must demonstrate that an unduly suggestive out-of-court procedure tainted the in-court identification. *Gregory-Bey v. Hanks,* 332 F.3d 1036, 1045 (7th Cir. 2003). Once that burden is met, "the court must then determine, under the 'totality of the circumstances,' whether the identification was sufficiently reliable to prevent misidentification." *Id.* Reliability is based on factors that include the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of her prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. *Neil v. Biggers,* 409 U.S. 188, 199-200 (1972); *Gregory-Bey*, 332 F.3d at 1045.

In this case, the Indiana appellate court held that M.W.'s in-court identification of Pinkins was not tainted because M.W.'s identification of Pinkins at the pretrial hearing provided an adequate, independent basis for her in-court identification that was not unduly suggestive or conducive to irreparable mistaken

identification. Citing *Logan v. State*, 729 N.E.2d 125, 131 (Ind. 2000), the court explained:

> When determining the existence of an independent basis, the following circumstances should be considered:
>
> The amount of time the witness was in the presence of the perpetrator and the amount of attention the witness had focused on him, the distance between the two and the lighting conditions at the time, the witness's capacity for observation and opportunity to perceive particular characteristics of the perpetrator, the lapse of time between the crime and the subsequent identification.

The court then determined that:

> Here, the evidence revealed, and the post-conviction court found that:
>
> At the time she was abducted, M.W. saw [Pinkins] for approximately five seconds at close range during their struggle. She then watched [Pinkins] get into the passenger side of her car as she was being dragged back to her assailant's car. Moreover, M.W. observed [Pinkins] under the light of the bright beam headlights of the car he had been driving, in an area illuminated by streetlights, and a nearby traffic light.
>
> M.W. had also identified Pinkins as one of the perpetrators five months after the attack in a situation that was not unduly suggestive or conducive to irreparable mistaken identification. Therefore, this prior identification demonstrates that M.W. had an independent basis to recognize Pinkins as one of her attackers . . . . As a result, an objection to the in-court identification would not have been sustained, and Pinkins's trial counsel was not ineffective for failing to object.

*Pinkins*, 799 N.E.2d at 1095. This analysis correctly identifies the governing legal rule even though no federal case is mentioned directly. *See Early v. Packer*, 537 U.S. 3, 8 (2002). Moreover, it is not objectively unreasonable.

Pinkins's argument only briefly addresses the state appellate court's analysis. He contends that in reaching its decision the appellate court failed to consider evidence that shortly after the attack, but before the pretrial hearing, M.W. had been asked to view photographs of the suspects. This argument is without merit, however, because M.W. refused to look at the photographs, rendering them wholly irrelevant to her later in-court identification. The

remainder of Pinkins's brief merely rehashes arguments he presented to the Indiana courts; he makes no effort to explain how the state appellate court's analysis might be objectively unreasonable.

For the foregoing reasons, we AFFIRM the district court's judgment denying Pinkins's petition for habeas corpus.